UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 18 CR 734 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| | ) | |
| TERRY FERGUSON | ) | |

**MOTION TO DISMISS INDICTMENT
FOR SELECTIVE AND VINDICTIVE PROSECUTION**

Now comes the Defendant, Terry Ferguson, through his attorney, BEAU B. BRINDLEY, and moves this Honorable Court to dismiss the indictment against him in this case for selective and vindictive prosecution. In Support, Mr. Ferguson states as follows:

**ARGUMENT**

**I.    THE CHARGES AGAINST MR. FERGUSON SHOULD BE DISMISSED ON THE BASES OF SELECTIVE AND VINDICTIVE PROSECUTION.**

**A.    Applicable Law**

This Court's authority to dismiss an indictment brought by the United States government derives from three sources: the Constitution of the United States, the Court's supervisory authority, and Rule 12(b) of the Federal Rules of Criminal Procedure. *United States v. Linder*, No. 12 CR 22, 2013 WL 812382, at *26 (N.D. Ill. Mar. 5, 2013), *appeal dismissed* (July 2, 2013) (internal citations omitted). A district court not only has the power but the "duty" to dismiss an indictment brought in violation of the Constitution of the United States. *United States v. Hyder,* 732 F.2d 841, 843 (11th Cir.1984); *United States v. Howell,* 552 F.3d 709 (8th Cir.2009). This includes circumstances involving prosecutorial misconduct. *United States v. Mills,* 995 F.2d 480,

1

486 (4th Cir.1993) ("We review indictments for constitutional error and prosecutorial misconduct."); *United States v. LaMantia,* 59 F.3d 705, 707 (7th Cir.1995).

Generally speaking, the United States Attorney's Office maintains broad discretion to enforce the criminal laws of the United States. Nevertheless, "a prosecutor's discretion is 'subject to constitutional constraints.'" *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996) (citing *United States v. Batchelder,* 442 U.S. 114, 125 (1979)). While a prosecutor's charging decisions are initially presumed valid, a hearing is warranted where a defendant "affirmatively show[s] through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *United States v. Bullis*, 77 F.3d 1553, 1558 (7th Cir. 1996). "The Constitution prohibits the government from undertaking a prosecution based solely on a vindictive motive. '[F]or an agent of the [United States] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights' is 'a due process violation …'" *United States v. Jarrett*, 447 F.3d 520, 524-25 (7th Cir. 2006).

Similarly, the right to equal protection under the Due Process Clause of the Fifth Amendment bars the government from making the decision to prosecute based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles,* 368 U.S. 448, 456 (1962). The doctrines of selective and vindictive prosecution are somewhat intertwined but also distinct in the standards they apply.

### 1.    Law Regarding Vindictive Prosecution

The courts have recognized two forms of prosecutorial vindictiveness: actual and presumptive. In order to establish actual vindictiveness, the defendant "must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form

of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *United States v. Jarrett,* 447 F.3d 520 (7th Cir. 2006) (quoting *United States v. Falcon,* 347 F.3d 1000, 1004 (7th Cir. 2003)); *United States v. Bullis,* 77 F.3d 1553, 1559 (7th Cir.1996); *see also United States v. Johnson,* 221 F.3d 83, 94 (2nd Cir.2000)). "A defendant may do this by showing that the decision to pursue an indictment was not based on the "usual determinative factors" a responsible prosecutor would consider before bringing charges." *United States v. Jarrett,* 447 F.3d 520 (7th Cir. 2006) (quoting *United States v. Spears,* 159 F.3d 1081, 1086 (7th Cir.1998)).

To secure an evidentiary hearing on a motion alleging *actual* vindictiveness, the defendant "must offer sufficient evidence to raise a reasonable doubt that the government acted properly in bringing the [subsequent] charge." *United States v. Falcon,* 347 F.3d 1000 (7th Cir. 2003) (citing. *Monsoor,* 77 F.3d at 1034). Essentially, "A court must be persuaded that the defendant would not have been prosecuted but for the government's animus or desire to penalize him." *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir. 2006) (citing, *United States v. Monsoor,* 77 F.3d 1031, 1034 (7th Cir.1996); *United States v. Goodwin,* 457 U.S. 368, 380 n. 12, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). Once the defense comes forward with evidence of vindictiveness, the burden shifts to the government to "to show that the motivation behind the charges was proper." *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir. 2006) (*Bullis,* 77 F.3d at 1559)).

However, because "motives are complex and difficult to prove," the defendant may also establish vindictive prosecution by showing that the circumstances of the case give rise to a "reasonable likelihood of vindictiveness." *Goodwin,* 457 U.S. at 373. This doctrine is called "presumptive vindictiveness." *Id.* ("[I]n certain cases in which action detrimental to the

defendant has been taken after the exercise of a legal right, the Court has found it necessary to "presume" an improper vindictive motive. Given the severity of such a presumption, however—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the Court has done so only in cases in which a reasonable likelihood of vindictiveness exists."); *See, also, United States v. Dickerson,* 975 F.2d 1245 (7th Cir. 1992) ("where 'action detrimental to the defendant has been taken after the exercise of a legal right' and 'a reasonable likelihood of vindictiveness exists'--an improper vindictive motive is presumed") (quoting *Goodwin,* 457 U.S. at 373). The Supreme Court adopted the presumption of vindictiveness, in part, "to spare courts the 'unseemly task' of probing the actual motives of the prosecutor." *Goodwin,* 457 U.S. at 372 (internal quotations omitted).

The presumption applies where 1) "action detrimental to the defendant has been taken after the exercise of a legal right" and 2) the situation is one that generally gives rise to "a reasonable likelihood that vindictiveness exists." *Edwardsen v. McCaughtry,* 977 F.2d 585 (7th Cir. 1992). Once this standard is met, the prosecutor is able to "rebut the presumption by disproving *both* (1) actual vindictiveness and (2) the appearance of vindictiveness." *Edwardsen v. McCaughtry,* 977 F.2d 585 (7th Cir. 1992) (emphasis added).

In sum, in order to establish actual vindictiveness, the defendant must present objective evidence of specific prosecutorial animus against the specific defendant. In order to establish a presumption of vindictiveness, "the circumstances ... must be sufficiently suggestive of vindictive prosecution that when similar circumstances are presented in other factual contexts, the same conclusion would be suggested." *United States v. Wilson,* 262 F.3d 305, 317-8 (4th Cir.2001) (citing *Goodwin,* 457 U.S. at 381, 102 S.Ct. 2485).

### 2.      Law Regarding Selective Prosecution

A defendant may establish a selective prosecution either by establishing that a particular prosecution is directed against him because of his membership in a specific group, or he may establish that he constitutes a "class" of one, and was specifically signaled out for prosecution based on illegitimate motives. "To establish a prima facie case of selective prosecution, [a defendant] would need to establish that he was singled out for prosecution while others similarly situated were not prosecuted, and next must demonstrate that the discriminatory selection was based on arbitrary classification." *Bek v. United* States, No. 2:03 CR 4(01)RM, 2008 WL 5069329, at *7 (N.D. Ind. Nov. 24, 2008) (citing *Jarrett v. United States,* 822 F.2d at 1443 (citing *United States v. Rodriguez,* 803 F.2d 318, 320 (7th Cir.1986)); *see also United States v. Cyprian,* 23 F.3d 1189, 1196, n. 10 (7th Cir.1994); *United States v. Monsoor,* 77 F.3d 1031, 1034 (7th Cir.1996). To show discriminatory intent, the defendant must present some evidence supporting an inference that improper considerations played a part in the decision to prosecute him. *See Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001).

Again, the standard to merit an evidentiary hearing on selective prosecution is relatively lenient. The question is whether a reasonable doubt exists as to whether the prosecutor acted improperly in selecting the defendant for prosecution. *United States v. Armstrong,* 517 U.S. 456, 458 (1996). If the defendant can identify a single similarly situated individual who was not prosecuted for substantially similar conduct, then he has made a prima facie case for selective prosecution and an evidentiary hearing must be held at which the government must justify the propriety of selecting the defendant for prosecution while other similarly situated individuals were not prosecuted.

### B.      The Evidence Establishes That Mr. Ferguson Was Singled Out For Prosecution and Treated Differently From Similarly Situated Individuals

The record in this case is replete with examples of Mr. Ferguson being treated unfairly during the investigation and prosecution of this case. It is replete with instances in which Terry Ferguson was treated in a fashion that is undeniably and significantly different from the treatment received by any other similarly-situated defendant. Law enforcement officers that headed up this investigation unfairly targeted Mr. Ferguson in a way, the only reasonable explanation for which, could be some sort of personal animus or effort at self-vindication rather than objective law enforcement. They engaged in tactics that no one would ever claim to be appropriate or reasonable or legitimately used against any other similarly situated individuals.

From the acts of entrapment that were used to generate the charges in this case, to the unconstitutional and dishonest acts taken during the search of Mr. Ferguson's residence, to the attempts at interfering with his attorney client relationship, to the peculiar use of the state court charges behind the back of the U.S. attorneys handling this case, to the inexplicable withholding of valuable evidence—every step of the investigation and prosecution of Mr. Ferguson has demonstrated a pattern of agents treating him far differently from similarly situated defendants facing similar charges.

**Entrapment**

As this Court is already aware, there is no question that Mr. Ferguson was induced into participating in the offenses at issue in this case. Mr. Ferguson responded to repeated requests to provide narcotics by law enforcement. The involvement of drugs as payment for the sale of goods was specifically requested by the agent, not initially offered by Mr. Ferguson of his own volition. Mr. Ferguson was not soliciting drug sales at all. Instead, he was taking advantage of an extraordinary opportunity that was presented to him after the undercover agent refused to agree to let the goods be purchased with cash rather than drugs. Mr. Ferguson never, on his own,

offered or suggested that he could provide illegal items to the undercover agent. He never once offered to sell anyone guns. He never once suggested that he wanted to use drugs as a means of payment for any of the items law enforcement was selling. Everything was specifically requested by the government and driven by their demands. This in itself is wildly different treatment from that received by a typical defendant who is suspected of selling stolen goods, which is all Mr. Ferguson could have even been accused of doing. Agent Labno specifically targeted Mr. Ferguson out of some sort of personal animosity and took steps to increase the severity of the offense that he could create a prosecution for, rather than merely arresting him for the type of offenses with which he believed he was already, as any agent would presumably do with any other similarly-situated suspect.

This case began when Agent Labno approached Mr. Ferguson with a financial opportunity. More specifically, Labno gave Mr. Ferguson an extraordinarily lucrative financial opportunity. He gave him absurdly cheap prices to purchase North Face jackets and cigarettes. He did it knowing that Ferguson was a buyer and seller of goods of these kinds. When he first approached Mr. Ferguson, Agent Labno sold cigarettes and North Face jackets for cash. This was the business that Mr. Ferguson was accustomed to doing. The goods were very valuable and sold for a very cheap price. When offered the items, Mr. Ferguson never suggested anything about using cocaine for payment. He never suggested using guns as payment. It was Agent Labno who suggested it. Mr. Ferguson initially told him that he does not do that—deal with guns or drugs. Yet, Agent Labno persisted.

The undercover recordings made by Agent Labno do not include a recording of this initial sale and interaction. However, the reports regarding Labno's meetings with Mr. Ferguson prove that there were indeed unrecorded meetings, which should not have happened. On November 9,

2015, Agent Labno obtained firearms from Jesus Domiguez in exchange for North Face jackets. This was done at Labno's request. Mr. Ferguson never handled the firearms. Mr. Ferguson did not participate in the sale of the firearms. Mr. Ferguson did not discuss any sale of firearms with Agent Labno. All of this was between Dominguez and Labno. Mr. Ferguson's only role was to allow other people to use his truck while transporting guns. He loaned them the keys to a truck. He never pursued or agreed to any firearm sale. Nor did he have any information about the theft of any firearms. They took advantage of him because he was willing to lend them his truck.

Prior to November 9, 2015, there is no agent report reflecting a single sale of goods from Labno to Dominguez or Ferguson. Yet, the content of Dominguez's recorded conversations with Labno expose the fact the prior unreported and unrecorded sales of goods did occur. On November 8, 2015, Dominguez made a call to Labno at 21:07. This is reported at ROI 6, paragraph 8. Dominguez begins this conversation by stating "that he (DOMINGUEZ) was wondering if SA Labno still had any NFL jerseys because people have been asking him." From this language, it is clear that Labno previously sold jerseys to Dominguez, which were well received by Dominguez's associates. Labno responds by talking about checking to see if there are any "more." The question raised by this small exchange is: where is the report of this prior sale of goods from Labno to Dominguez? There is none in the discovery material provided. There is none in the ROI's documenting this investigation. But, there should be. There would be no good reason for any such sale to have occurred without agent reporting. But, ROI 6 illustrates that it did. Mr. Ferguson paid cash and received North Face jackets and cigarettes for an incredibly cheap price. Labno knew how valuable these items were to Mr. Ferguson. Similarly situated suspects are not subjected to this manner of unreported manipulation. Yet, Terry Ferguson was.

After that sale, Labno asked Ferguson if he could trade North Face jackets and cigarettes for cocaine or firearms. Mr. Ferguson responded: I don't do that. While that conversation is not recorded in the ROI's, many instances in the ROI's support Mr. Ferguson's assertion.

As an initial point, in his conversations with Labno, Dominguez continually asserts that his associate (Ferguson) really wants additional North Face jackets. See ROI 6 at paragraphs 5 and 10. Dominguez describes Ferguson as "bugging the shit out of him [Dominguez] for the jackets." ROI 6 at paragraph 14. This occurred on November 9, 2015. The reporting suggests that the first set of North Face jackets was provided on November 9 in exchange for firearms. If that were so, then how could it be the case that Ferguson could have been "bugging the shit" out of Dominguez for more of the jackets even before they had been received for the first time? That is not possible. However, if Labno did sell such jackets to Ferguson for cash prior to that, as Ferguson asserts, this would make sense of Dominguez's recorded statements. Ferguson had been bugging Dominguez for more North Face jackets because he had bought them from Labno before in exchange for cash only. On November 12, 2015, Dominguez again refers to Ferguson bugging him about North Face jackets. This is reported at ROI 6 at paragraphs 22 and 23.

Again, on November 15, Dominguez tells Labno that Ferguson is seeking North Face jackets. He quotes Ferguson as saying: "And watch when I got these fuckin' jackets. 'Um yeah, bro. You know what Im sayin I ain't got all the money right now, you know. You think you can give them to me, and I'll go sell em and bring you back the money?'" ROI 6 at paragraph 25. One can see from Domiguez's statement that, for Mr. Ferguson on his own, obtainment of these jackets is all dependent on cash, not any sort of controlled substance. This is why this case amounts to, at best, an example of entrapment—crimes that would not have been committed if not for the government insisting that guns or drugs be received in exchange for

9

goods. On his own, Mr. Ferguson never suggested the use of any form of payment other than cash. Yet, Labno insisted on cocaine. Over and over again. This does not happen to similarly situated defendants.

On November 23, 2015, Dominguez asks Labno again about North Face jackets and jerseys. He explicitly tells Labno that they (he and Ferguson) have $10,000 cash. ROI 6 at paragraph 34. Hence, in the mind of Ferguson, the purchase of these items is going to be accomplished with cash and nothing else. The discovery supports his claim that he had purchased these items with cash before and wanted to continue using cash to make these purchases in the future. He did not want to deal with guns or drugs and did not ever, on his own, suggest using guns or drugs as a form of currency. It was always insisted on by Labno.

The next day, there is a discussion of selling the North Face jackets for a combination of speakers and cash. Once again, it is notable that no one is suggesting a trade of cocaine to Labno. ROI 6 at paragraph 35.

Between November 24 and December 3, 2015, Dominguez repeatedly asks about obtaining the North Face jackets by way of an exchange for cash and either speakers or kegs of beer. There is not even a hint that Ferguson had ever wanted, or considered, exchanging cocaine for these items that he obviously wants to obtain. ROI 6 at paragraph 35 and 38; ROI 10 at paragraph 3.

On December 3 and 16, 2015, North Face jackets are exchanged for speakers, kegs of beer, and cash. There is never a mention or suggestion that they would trade cocaine for such merchandise if left to their own devices. Ferguson's intense desire to obtain more of these North Face jackets is apparent all throughout the discovery. ROI 11 at paragraph 19 and 20; ROI 19 at paragraph 4 and 19. It is that desire that Labno chose to use to make transactions that should

have been all about cash payments into transactions involving cocaine as payment. This does not happen to similarly situated suspects. There is no good faith reason for such things to happen.

There is no indication that, on his own, Terry Ferguson ever suggested to Dominguez or Labno that these items could be purchased with cocaine or firearms. In fact, the first mention of cocaine (which is referenced by the slang term girl or white girl) on the recordings occurred when Labno brings it up to Dominguez. ROI 4 at paragraph 26. There, Labno is suggesting that he may be able to get kilos to sell to Dominguez. Dominguez does not respond by suggesting that Ferguson has cocaine that could be provided to Labno. Throughout the discovery, it is consistently Labno who suggests making cocaine a part of the transactions for North Face jackets and cigarettes. ROI 6 at paragraphs 8 and 19. As of November 12, 2019, the discussions are still about Labno selling cocaine to Dominguez. If Ferguson was a common source of supply for cocaine, then it is hard to understand why it would not come up in this conversation. It did not come up because, on his own, Terry Ferguson did not sell cocaine.

Mr. Ferguson's reticence to be involved in dealing with cocaine is further supported by the ROI's in the case. On August 31, 2016, he has the following exchange with Labno: "What are you at for a zip? Eight hundred or a stack(a thousand dollars)?" FERGUSON responded "I don't even know what that is." SA Labno answered, "an ounce." FERGUSON responded, "I don't even talk like that. It's four thousand." ROI 76 at paragraph 7. If up to Mr. Ferguson, he always wanted to deal only in cash. Agent Labno wanted it to be something else so that he could make a case against a man that simply did not sell cocaine on his own. That does not happen to similarly situated defendants who are being fairly and legitimately pursued by law enforcement.

At ROI 75, paragraph 23, the following comments from Mr. Ferguson are noted. "FERGUSON then suggested that he really did not deal in cocaine much." This is consistent

with what Ferguson describes as his prior discussion with Labno where he suggested trading cocaine and Ferguson responded by saying: "I don't do that."

When Labno attempts to talk to Ferguson about the purchase of guns and drugs, Ferguson says: "Yeah, but I don't fuck with them on that level. You know if you 're a gang banger I don't want no part of it." SA Labno asked if it was too much "heat,', and FERGUSON replied, "I don't like to fuck around with it too much at all-that's trouble." Mr. Ferguson does not want to deal with drugs or guns. Yet, he is continually pursued.

A text message conversation noted in the discovery provides further corroboration. On December 14, 2016, the following texts were exchanged:

SA Labno: 510 [cigarettes]
FERGUSON: Best cash u do
SI A Labno: My battery on my old truck died im changing u talk hard to text right now
FERGUSON: Just need bottom line
SI A Labno: Im trying to do the other cuz I get a better exchange rate ya kno
SI A Labno: I need 18 so Jike 37 a piece
FERGUSON: I understand still need bottom line

ROI 82 at paragraph 9. Here, Mr. Ferguson is asking for a cash price. Agent Labno is trying to do "the other" (cocaine). It is always Agent Labno trying to push this to cocaine involvement and Mr. Ferguson trying to simply purchase items for cash. Similarly situated suspects who do not want to exchange cocaine for merchandise are not repeatedly urged to engage in drug transactions.

Again, when trying to purchase cigarettes, Mr. Ferguson says "I'll tell you what we'll do. We'll split the profit on everything. I'll tell you what he pays-forty-five dollars a carton. So, I'll bring you to him, he's got cash all the time." When it's up to Ferguson, the purchase will be in cash. How does Labno respond? "Labno then asked FERGUSON if he could trade the cigarettes for cocaine. Specifically, SA Labno said, 'Can I do the other with you-just give you the cash.'

ROI 83 at paragraph 8. Mr. Ferguson proposes cash. Labno pushes him to make cocaine a part of the deal. He does it again and again. See also ROI 84 at paragraph 15.

When acting on his own, Mr. Ferguson did not ever pursue the use of cocaine to purchase goods. He did know people from whom he could get it if he had to. But he did not prefer to involve cocaine. He expressed this to Labno. Labno insisted it had to be cocaine if he wanted to get the items he was desperate to obtain and sell. None of that should ever have happened. There should never have been any drug or gun case against Terry Ferguson. But, because Agent Labno wanted to make one, this was repeatedly pursued. Similarly situated offenders do not get subjected to this kind of treatment.

When talking to a drug trafficker named Velasquez, Labno indicated he liked the quality of "Ferguson's" cocaine. The response was telling: "VELASQUEZ laughed and stated, "You've been getting my shit off him too." ROI 97 at paragraph 6. Just for these government initiated transactions, cocaine was being obtained from Velasquez by Ferguson so Labno could get what he wanted in exchange for the jackets and cigarettes. On his own, without government intervention, there is no indication this would have happened at all. Terry Ferguson did not initiate any such sale on his own. He did not initiate any sale of guns for merchandise on his own. He preferred to stay away from these kinds of transactions and told the agent that. Labno knew he wanted the goods that were initially sold to him for cash. And Labno made those transactions about cocaine. This is not a tactic that is or ever should be permitted when pursuing cases against similarly situated individuals. Terry Ferguson was a seller of goods, which one could argue might be stolen. However, the pursuit of such potential offenders does not involve the insistence that cocaine be the form of payment. That is obvious. No one could dispute it.

Hence, from this alone, it is apparent that Mr. Fergsuon is being treated differently from similarly situated individuals.

Agent Labno pursued Mr. Ferguson to make him into a purveyor of guns and drugs. On his own, without suggestion and pursuit by the agents and their agenda to make a case, he sold neither. There is no evidence that Mr. Ferguson would have ever even permitted the use of his truck to transport guns if it had not been for Labno requiring that as payment for merchandise that Mr. Ferguson wanted to buy for cash. There is no evidence that he would have ever, on his own, suggested trading cocaine for goods without being pressed to do so by the repeated urgings of Agent Labno. The only purpose of this kind of pursuit was to artificially generate a drug quantity and make Mr. Ferguson part of the guns and drugs trade in which he did not participate on his own. This is an undeniable example of a government agent unfairly targeting Mr. Ferguson for his own personal reasons rather than in pursuit of a legitimate law enforcement goal. Other similarly situated defendants who sell goods that are feared stolen are not subjected to this treatment. It was instigated here by an agent with a personal agenda who saw to it that this selective and vindictive prosecution was carried out against Mr. Ferguson.

### 1. Illegal Search

This Court is well aware of videos and facts surrounding the search of Mr. Ferguson's residence. Officers conducted a search and then falsely claimed it was some sort of protective sweep. This Court has already expressed its opinion that this was no protective sweep. The Fourth Amendment was plainly violated. Mr. Ferguson's teenage daughter was dragged out of the residence when the agents came to the door. His wife was led to believe she was not allowed to leave the residence, that she had to go and obtain a phone for the agents and give it to them, and that agents had lawfully discovered a stolen lawnmower that she had to agree to release to

them. None of this was true. There is no part of a protective sweep that involves taking down a lawnmower serial number to compare to see if it is stolen. If you take time to look at a serial number, you are not doing a protective sweep. The lawnmower was not lawfully discovered to be stolen. Mrs. Ferguson was not required to remain in the residence to talk to some agent from the IRS. Yet, the agents perpetrated all of this. They wantonly violated Mr. Ferguson's Fourth Amendment rights. They drafted agent reports on the incident, which contained information this Court has already found to be false. They responded to the realization that their conduct was being recorded on video by immediately (and unsuccessfully) attempting to locate and dismantle the video recording system. That does not happen to similarly-situated defendants.

It is safe to assume (one hopes) that the typical defendant who is in all other respects similarly situated to Mr. Ferguson is not subjected to this treatment—the plain and unabashed violation of his Fourth Amendment rights. Here, the same agent who exhibited personal motives for improperly targeting Mr. Ferguson with manufactured drug and firearms charges dishonestly concocted cover stories for ordering his team to illegally search Mr. Ferguson's residence. This was done with the sole design of singling out Mr. Ferguson for prosecution. It was done vindictively, and it was done selectively, in a manner that is not experienced by any similarly situated defendant. It is impossible to imagine that the combination of tactics noted above and during this search was ever used on any similarly situated defendant. The government will surely not suggest that these tactics are somehow commonplace or endorsed against any other suspects.

## 2. Interference in the attorney-client relationship

But the conduct of these apparently self-interested agents did not stop with what went on in the house and the garage at Mr. Ferguson's Willowbrook residence. Agents knew that Mr. Ferguson was represented by counsel. They even knew who his attorney was. Yet, they ignored

that fact and proceeded to interrogate him. Dkt. 161-1 at 2-3. That was a plain and obvious violation of his Fifth and Sixth Amendment rights. Worse yet, Agent Labno specifically asked Mr. Ferguson if he could somehow provide incriminating information about his lawyer, the undersigned. According to the reports, this is what immediately followed the arrest of Mr. Ferguson at his home. Perhaps this was Agent Labno's hope all along—that by unfairly targeting and abusing the rights of Mr. Ferguson and treating him in ways no other similarly situated defendant ever would be, he could somehow intimidate him and obtain incriminating information about the undersigned who has a long attorney-client relationship with Mr. Ferguson. That is simply not something to which uncharged, similarly situated suspects are ever subjected.

After some questioning on this subject, Mr. Ferguson told them his lawyer does not do anything about which he could report. Yet, Labno responded to knowledge that the defendant was represented by counsel by endeavoring to (1) interfere with the attorney/client relationship; and (2) intentionally violate the defendant's Fifth and Sixth Amendment rights by questioning him while knowing he was represented by a lawyer that was well known to the agent himself. This was egregious behavior. But he did it. He did it in conjunction with violating Mr. Ferguson's Fourth Amendment rights and unlawfully manipulating his wife into releasing a lawnmower, the serial number for which was illegally obtained. It strains credulity to think that any similarly situated defendant has ever been subjected to the combination of tactics noted here. It simply does not happen. It would be an outrage if it did. The fact that it happened to Mr. Ferguson is proof that he was indisputably treated differently from similarly situated defendants. He was put in a category of 1 and subjected to unfair and illegal treatment to which no other similarly situated defendant ever is.

16

This example of Labno's efforts to undermine the attorney/client relationship and talk to a represented person provide examples of Agent Labno exhibiting biased and unusual behavior against Mr. Ferguson. This demonstrates yet again that Agent Labno did not have a legitimate motive in investigating Mr. Ferguson. He singled out Mr. Ferguson. He ignored the law when interacting with him. He treated him far differently from the manner in which this Court would allow any similarly situated defendant to be treated. And all available evidence demonstrates that he did so specifically because of some sort of personal animosity against Mr. Ferguson or perhaps his attorney. There is no other way that such a pattern of improper agent behavior against one particular defendant could be explained.

### 3. Other Proceedings Following Indictment

Agent Labno continued to take improper and dishonest actions against Mr. Ferguson even after charges were brought in this case. While these actions cannot directly demonstrate whether the charges in the indictment were the result of selective or vindictive prosecution, they do provide further examples that show that Agent Labno, who spearheaded the investigation that resulted in the prosecution now before the Court, was guided by personal motives and bias against Mr. Ferguson when he took the actions that led to the government bringing the indictment in the

Agent Labno attended court proceedings in Kenosha, Wisconsin, regarding the stolen lawnmower. He provided false information to the state's attorney that resulted in Mr. Ferguson having to post a $100,000 cash bond. Only months later was that bond reduced by half due to the judge's acknowledgment that there was indeed no good basis for the $100,000 bond. Yet, Mr. Ferguson and his family had to struggle to obtain that money to secure his release.

17

In addition, Labno took steps that victimized members of Mr. Ferguson's family. His niece, Debbie Millwood, is mentally impaired and suffers from PTSD as the result of significant trauma from molestation at a young age. Labno used child services to call this woman and lead her to believe she had to appear to discuss the custody of her children. When she got there in a state of anxious concern, she was put in a room with Labno and another agent. They tried to get her to say that her uncle had mishandled her settlement money related to her molestation, and that he has somehow stolen from her. She refused. They let her believe that her kids would be taken away if she did not help them. They offered her financial benefit if she was to incriminate her uncle. They ignored her when she told them that she was represented by the undersigned and asked them to call him. She could not provide any incriminating information about her uncle and she has subsequently suffered from worsening bouts of PTSD and anxiety regarding the loss of her kids. For a long period of time, she was essentially unwilling to leave the house and is constantly paranoid that her kids will be taken from her as a result of these underhanded manipulations by Agent Labno. That does not happen to similarly-situated defendants. That evinces a personal bias and improper motive that resulted treating Mr. Ferguson as a class of one.

Agent Labno also saw to it that Mr. Ferguson's son, Timothy Ferguson, was threatened on the day of his father's arrest. Tim Ferguson was told that he would lose his kids if he did not give consent to search a garage, to which Mr. Ferguson agreed out of fear. That does not happen to similarly-situated defendants. But it happened here.

Agent Labno did not stop with Mr. Ferguson's relatives. He went on to coercively pursue Mr. Ferguson's friend, John Dier. One day after this Court's critical comments about the search at Willowbrook, Labno participated in the circumvention of the Cook County judicial process to get Mr. Dier arrested without any warrant at all. It was Agent Labno who was in the room where

John Dier was taken. And it was Agent Labno who then asked Dier to give him something incriminating on Mr. Ferguson. He promised that Mr. Dier would go scot-free if he incriminated Terry Ferguson. He told him to worry about his own family, not Mr. Ferguson's. Mr. Dier could not do so. Again, this pattern of behavior simply does not ever get employed against any similarly situated defendant. It is difficult to imagine how it could. Over and over again, the behavior of Agent Labno illustrates that Mr. Ferguson was repeatedly treated as a class of one and subjected to conduct to which similarly situated defendants are not.

Agents also approached a man named Pat Anderson who lived in a storage unit utilized by Mr. Ferguson. As a result of those interactions with Pat Anderson, felony charges for witness intimidation were brought against Mr. Ferguson. He was put in custody for over a year. Yet, in the end, what turned out to be the case was (1) he told Pat Anderson that he should get a lawyer after receiving a grand jury subpoena and that he could get in trouble if he did not have a lawyer; and (2) the claims Anderson made in interviews with Labno were specifically contradicted by statements he made to the grand jury. Everyone involved in the prosecution knew that the statements Labno put in the report were starkly contradicted by the grand jury testimony. The witness could never have been presented in good faith. The case was reduced to a misdemeanor on the eve of trial and the parties agreed to Mr. Ferguson's release in exchange for a misdemeanor plea, no jail time, and release on bond. That certainly does not happen to similarly situated defendants. Mr. Ferguson suffered in jail under the threat of felony charges for over a year. Yet, all along, the key witness's testimony was never going to hold up based on what he told the grand jury, which contradicted what he told the agents. That, combined with all of what is noted above, does not, should not, and cannot happen to similarly-situated defendants. The only way it can be explained is through improper personal motives on the part of the agent and

the treatment of Mr. Ferguson as a class of one, subjected to treatment similarly situated defendants never face.

ATF agents then took additional steps against Mr. Ferguson without the knowledge of the U.S. Attorney's Office. This was the reason for the withdrawal of Mr. Ferguson's plea in this case. ATF agents who investigated this case went to the Illinois Attorney General's Office to bring charges against Mr. Ferguson in Will County for the sale of stolen goods. The acts about which they gave information were part of the undercover investigation in this case. The ATF agents from this case took conduct that was part of this federal investigation and gave it to the attorney general to seek charges without the knowledge of the USAO. That sounds outrageous. But, no one denied that it happened.

When the undersigned first heard about the possibility of this, he contacted government counsel as he did not believe it could be accurate. Government counsel knew nothing about it. When Mr. Ferguson entered his plea in this case, he and the undersigned believed that plea resolved all allegations of the conduct that was part of the federal investigation in this case. As previously noted, after 16 years of working on federal criminal cases like this, the undersigned has never once seen an incident where a federal investigation took place, the parties agreed to a plea to resolve the federal charges and put an end to the case, and the federal agents turned around and took parts of that investigation to some other prosecuting authority without the knowledge of the US Attorney's Office or notice to the defense. But, they did that in this case. The idea that Mr. Ferguson is not put in a class of 1, precisely as the doctrine of selective prosecution requires, is simply impossible to believe when the entire panoply of events of this case are considered as a whole.

Without even advising the U.S. Attorney's Office, the ATF agents pursued charges based

on some of this same conduct that was supposed to be resolved with the guilty plea. That just does not happen in similarly situated cases. All of this was done because Agent Labno, for his own personal reasons, was not satisfied that Mr. Ferguson had suffered enough or was angry that Mr. Ferguson did not give him what he wanted or what he hoped for. Taken in the context of the totality of his treatment of Mr. Ferguson in this case, it is apparent that this is merely another example of Agent Labno targeting Mr. Ferguson for his own personal reasons, treating him disparately from all other similarly situated defendants, and doing so because he is personally biased against Mr. Ferguson for reasons that he has allowed to overwhelm his professional judgment and lead him to improperly persecute Mr. Ferguson instead of faithfully exercising his duties as an agent of the United States government.

### 4. Failure To Disclose

In addition to all of the conduct noted above, Mr. Ferguson has suffered other peculiar treatment throughout the pendency of this case. First, the ATF agents engaged in detailed discussions with a witness named James Burgert, who is involved with the Will County and Wisconsin state cases. Recorded interviews of state investigators include them referring to hours Burgert spent consulting with ATF agents. When Burgert's comments were inconsistent with whatever he supposedly told the ATF, he was told that he could lose his deal, that his bond conditions would change, and that he needs to think it over. Then, Burgert subsequently came back and told a completely different story. Setting aside the impropriety of a threatening a witness for giving a statement inconsistent with the wishes of the ATF, the defense in Mr. Ferguson's case before this Court has never been provided with any reports of these statements taken by the ATF agents regarding conduct that is part of this investigation. Even though this evidence of a witness changing his story based on the explicit influence of the ATF in a case

where improper agent behavior provides the crux of the defense is a required disclosure under *Brady* and *Giglio*, no reports of these ATF interviews have been disclosed. One is left to wonder whether the US Attorney's Office has again been denied access to necessary information by the ATF agents that spearheaded the effort to bring the state case that led to the withdrawal of the guilty plea before this Court.

Some of the charges in this case stem from Mr. Ferguson being approached by an informant who went by the name of Casper. This informant was also influenced and handled by Agent Labno and the ATF agents pursuing Mr. Ferguson. This informant is a critical witness involved in this case. Mr. Ferguson has learned, by chance and accident, that this informant is deceased. The death of a significant witness is a material fact. It impacts the admissibility of evidence and can trigger Sixth Amendment concerns. Yet, for some unknown reason, the fact of this witness's demise has also never been disclosed to the defense in this case. It should have been. Under any reasonable application of *Brady*, it should have been. The failure to disclose fits in with a pattern of denying Mr. Ferguson the constitutional protections afforded to all similarly situated defendants. It provides further evidence that Mr. Ferguson has been, and continues to be, in a class of one, treated differently from any cognizable, similarly situated defendant.

Agent Labno has significant credibility problems. He has been accused of perjury by a fellow agent. That accusation led to what the Seventh Circuit has found to be the improper termination of ATF agent Adam Delgado (*Delgado v. Merit Systems Protection Bd.*, 880 F.3d 913 (7th Cir. 2018); *Delgado v. United States Dep't of Just.*, 979 F.3d 550, 553 (7th Cir. 2020)). The Seventh Circuit itself has indicated that there is ample evidence to support Delgado's contention that Labno committed perjury about firing shots at a fleeing suspect. This is, again, obviously *Brady* material. It is obviously *Giglio* material. It is evidence that calls into question

22

the credibility of the very agent whose undercover conduct created this case. Yet, it has never been disclosed to Mr. Ferguson. Reports and information regarding the investigation of Labno's conduct following the Delgado incident obviously exist, but have not been disclosed to Mr. Ferguson. This is an apparent and egregious violation of *Brady* and *Giglio*. And it further underscores a pattern of Terry Ferguson being treated disparately from all imaginable, similarly situated defendants.

In recent days, the undersigned has been advised regarding yet another incident of a judicial officer finding Agent Labno incredible. In *U.S. v. Romeo Holloway* (20 CR 381), the Court explicitly found Labno's testimony "grossly exaggerated, "not corroborated by the body cam footage," and "not credited by the Court." This opinion was issued on December 13, 2021. The only reason the undersigned is aware of it is because it was disclosed by the attorney general in the Will County case due to his *Brady* obligations. Yet, the government in this case has never disclosed the fact of this opinion, of which it was obviously aware, or any transcript of this contradicted testimony, which they undoubtedly have. Here again, the basic protections that apply to all similarly situated defendants are denied to Terry Ferguson. The pattern that began with improper agent inducement, a plainly illegal search, improper interference with the attorney/client relationship, and federal agent pursuit of charges from anther sovereign behind the US attorney's back continues with obvious violations of the requirements created by *Brady* and *Giglio.* Moreover, prosecutors in the Wisconsin case have suggested to defense counsel that Labno has resigned from the ATF. There has also been no discovery regarding this resignation. This too would be *Giglio* material to which Mr. Ferguson is entitled. Yet, it has not been provided. In what universe can anyone say that any similarly situated defendant has ever been subjected to this array of constitutional violations, one after the other? It simply does not happen.

23

It is unimaginable that it could happen to any similar defendant. That is the very essence of selective and vindictive prosecution. Whatever the reason, Mr. Ferguson has been singled out for outrageous and plainly unconstitutional treatment at each stage in this case. If ever there was an instance of selective prosecution based on a defendant being singled out and placed in a class of one to which improper treatment not employed against similarly situated offenders is applied, it is this case. Who in their right mind could contend that this pattern of behavior is used against any other defendant? Such an assertion would necessarily entail an assertion that the repeated and systemic violation of a defendant's constitutional rights at multiple phases of an investigation is somehow routine. No such assertion can be made.

When confronted by this panoply of repeated violations of a single defendant's constitutional rights, the manipulation and victimization of potential witnesses, the improper failure to disclose material, exculpatory, and impeaching evidence, and the improper and unnecessary inducement of a crime that did not have to happen, there comes a point when one must simply stop and say stridently: enough is enough. We have reached that point in this case. This is a selective prosecution. Mr. Ferguson has been targeted and treated differently than any imaginable similar defendant. That is the unavoidable realty of these facts. This case must come to an end and selective prosecution provides the vehicle through which it can be ended.

**Conclusion**

Taken as a whole, these facts plainly demonstrate that Mr. Ferguson was treated differently from all other similarly situated defendants. He was singled out and targeted, not because of what he had done, but because a government agent had some sort of personal vendetta against him that has resonated throughout the entirety of this case. This amounts to both selective and vindictive prosecution and requires a dismissal of the charges.

WHEREFORE, Mr. Ferguson asks the Court to order an evidentiary hearing on this matter and to ultimately dismiss the indictment against him.


Respectfully submitted,

By: s/ Beau B. Brindley
    Attorney for Defendant,
    TERRY FERGUSON


Beau Brindley
LAW OFFICES OF BEAU B. BRINDLEY
53 West Jackson Blvd.
Suite 1410
Chicago, IL 60604
312-765-8878 (Phone)
312-276-8040 (Fax)