**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| [redacted] | [redacted] | 172 |

## SUMMARY OF EVENT:

Execution of arrest warrant (18CR734) at 8143 S. Sunset Road, Willowbrook, Illinois.

## NARRATIVE:

1. **ARREST WARRANT:** On October 30, 2018, at approximately 06:00 hours, ATF Agents and Illinois State Police (ISP) along with Officers from Channahon, Naperville, Hodgkins and Kenosha executed a federal arrest warrant (18CR734) and later federal search warrants 18M689 and 18M684 issued from the Northern Judicial District of Illinois. The arrest warrant authorized the arrest of Terry FERGUSON, white male, DOB: [redacted] and the search warrants authorized agents to search the residence of FERGUSON located at 8143 Sunset Road, Willowbrook, Illinois, as well as FERGUSON's cellular telephone respectively. Present during the execution of these warrants was ATF Special Agents (S/A)s Christopher J. Labno, Christopher Burney, Madison Johnson, Brett O'Connor, Craig Fries, Group Supervisor Bennie Mims and Task Force Officers Walter Bucki, Christopher Stenzel and Sargent Thomas Hamilton, along with ISP Lt. Callaghan, Inspector Chris Linares and S/A Kaney, Troopers Peters, Kranc and Heenan, Channahon Deputy Chief Gunty, Detective McClellan and Sargent Brooks, Naperville Sargent Black, Detectives Elliot and Stahulak, Hodgkins Sargents Heller and Miller and Kenosha Wisconsin Police Officers Jon Hasselbrink and Kris Schwartz.

2. At approximately 06:00 hours on this same date, Agents and Officers including Willowbrook Police and DuPage County Sheriff marked units, approached 8143 S. Sunset Road, Willowbrook, Illinois. Agents and Officers announced their office and purpose, ringing the door bell and pounding on the door. After waiting for reasonable amount of time with no response, Agents observed lights turn on in the house and a minor female child open the front door of the residence. Agents then made entry and conducted a security sweep of the residence. During this security sweep S/A Burney observed FERGUSON exit the master bedroom on the second floor and begin to descend the stairs to the first floor. Agents then placed FERGUSON under arrest, handcuffed (double-locked). During a search of FERGUSON incident to arrest, Agents found a large bundle of United States Currency (USC) from both pockets of his jeans; while FERGUSON was initially allowed to maintain custody of this currency, it was later counted and seized by S/As Labno and Burney who found it to be a total of $3,466.98. Agents subsequently returned $1.98 in coin to FERGUSON's wife Cherie FERGUSON (see attached receipt).

| Prepared by: Christopher J. Labno | Title: Special Agent, Chicago I Field Office | Signature: | Date: 11-19-18 |
|---|---|---|---|
| Authorized by: Bennie Mims | Title: Group Supervisor, Chicago I Field Office | Signature: | Date: 11/19/18 |
| Second level reviewer (optional): Celinez Nunez | Title: Special Agent in Charge, Chicago Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

3. During the security sweep, Agents also encountered Cherie FERGUSON, as well as Haylie Roberts, Makenzie Roberts, Trace Ferguson, Tressa Ferguson, Gabby Radovick, Michael Radovick and Trent Ferguson.

4. In addition, during this security sweep, S/A Labno observed an Ariens Gravely Pro-Turn 260 riding lawnmower in the residence's garage. S/A Labno recognized this lawn mower as being stolen from Ariens Company Distribution Center located at 3737 84th Avenue, Kenosha, Wisconsin on April 24, 2018. The delivery of this equipment to FERGUSON at the Sunset residence by Joe RUSSO on April 30, 2018 is documented in a separate Report of Investigation (ROI). Kenosha Wisconsin Detectives Jon Hasselbrink and Kris Schwartz subsequently examined this piece of Ariens Gravely Pro-Turn equipment and viewed the serial number of the unit which was in plain view. Officers Hasselbrink and Schwartz were able to confirm that this serial number 070677 and model number 992269 was indeed stolen from an interstate shipment as described above. Officers Hasselbrink and Schwartz subsequently spoke with Cherie FERGUSON who agreed to allow these Kenosha Officers a limited consent to search for the stolen Ariens Gravely lawn equipment described above and Officers recovered this machine and transported it back to Kenosha, Wisconsin. Reference should be made to the attached Kenosha, Wisconsin Police Department Report Number 2018-00320025 for more information.

5. Once the premises were secure, S/A Labno spoke with Assistant United States Attorney Matthew Kutcher who advised that US magistrate Judge Cole had scheduled a meeting to sign a search warrant for 8143 S. Sunset, Willowbrook, Illinois for later this same date. S/A Labno should note that this search warrant (18M689) was subsequently signed at 13:00 hours on this same date, and that the execution of this search warrant is documented in a separate ROI.

6. At approximately 06:15 hours, S/As Labno and Burney approached FERGUSON and FERGUSON asked if S/A Labno could get him a shirt. S/A Labno got FERGUSON a shirt and asked if FERGUSON recognized S/A Labno. FERGUSON stated that he did recognize S/A Labno and understood he was in trouble. FERGUSON then asked to speak with Agents outside the residence.

7. Once outside the residence, Agents sat inside a government vehicle with FERGUSON and had a brief conversation. Specifically, S/A Labno advised FERGUSON of his rights pursuant to ATF form 3200.2. Specifically, S/A Labno read FERGUSON each of his rights and explained them, asking FERGUSON if he understood them. FERGUSON stated that he understood his rights and was willing to waive them and speak with Agents. At this point, Agents explained to FERGUSON that he was in custody for selling cocaine and FERGUSON stated I understand, I knew who you were. S/A Labno explained that other arrests were being made this same morning and search warrants executed. FERGUSON then related that he knew that he was in trouble and would help Agents one thousand percent. S/A Labno explained to FERGUSON that they were interested in obtaining his proactive cooperation. FERGUSON told Agents, "tell me what you want. It's all on the table." S/A Labno asked FERGUSON if he knew DOMINGUEZ's friend "Mark Anthony and his brother Mike." FERGUSON responded, "you know I do." FERGUSON then advised that he was willing to cooperate against the VELASQUEZ brothers saying—"everything's on the table."

8. FERGUSON then asked, "what are you going to do for me? I'm still in these cuffs and sitting here." FERGUSON then explained that he did not want to be sitting in front of his house in handcuffs and that the longer Agents had him there in that condition, the more likely he was to be unable to cooperate as everyone would know. Agents agreed and explained that they were interested in cooperating with FERGUSON but needed to have a more complete understanding of what FERGUSON could cooperate on in order to convince the United States Attorney's Office to release FERGUSON pending his cooperation. FERGUSON stated, "What do you need. I already told you Im with it a thousand percent. I'm not going anywhere, if you've been

investigating me you know that." S/A Labno stated that he understood that but that the USAO would ask for specifics. S/A Labno then asked if FERGUSON was willing to make buys of narcotics from his drug suppliers. FERGUSON stated that this would be easy. Agents told FERGUSON that they were also interested in buying illegal guns. FERGUSON indicated that while not as easy as drugs, "that can still happen." S/A Labno then told FERGUSON that investigators believed that he was involved in something shady with his lawyer Beau (BRINDLEY). FERGUSON replied, "Yeah?" Agents then indicated that by "shady," they meant criminal conduct. FERGUSON responded, "Yeah, like I said everything is on the table." S/A Labno again stated that the USAO would want specifics before they would agree with Agents to release FERGUSON. S/A Labno asked FERGUSON if he (FERGUSON) had BRINDLEY "dead to rights" on criminal conduct. FERGUSON responded, "I believe I do." Agents then asked if FERGUSON would be willing to proactively cooperate against BRINDLEY as well as the other individuals whom they discussed. FERGUSON stated that he would, saying, I told you I'm with you a thousand percent."

9. The conversation then turned to the impending search of the Sunset residence. Agents explained that they were waiting for a judge to sign a search warrant for this residence. Agents advised that if FERGUSON was willing to consent to a search of the residence he could do so. FERGUSON explained that he understood that Agents "had to do what they had to do," but that if Agents continued the heavy police presence and searched the residence his cooperation was at an end. FERGUSON stated that he was willing to cooperate because he got himself in this situation and did not want his family to suffer. In response to S/A Burney's questions, FERGUSON stated that there was "nothing in the house." FERGUSON stated, "You can look, you can run the dog through." FERGUSON stated that while there was nothing in the house, he did not want Agents tearing apart his residence while his family was there. S/A Labno then asked FERGUSON if he had any money in the residence, and FERGUSON responded that he had about $18,000. In United States Currency (USC) in the headboard of his bed. FERGUSON further explained that it was wrapped in a towel or shirt.

10. With regard to what Agents would find in other addresses where they were conducting searches FERGUSON explained that there was nothing in 7038 W. 72nd Street. In response to Agents questions, FERGUSON stated that he did not own 7029 W. 72nd Street and that KM and F owned that residence. S/A Labno asked FERGUSON what KM and F stood for and who owned that company; FERGUSON responded, "look it up." S/A Labno indicated that he was aware FERGUSON's son, Tim FERGUSON, resided at that address and that Agents would seek to search the house. FERGUSON replied, "There's nothing in that house." S/A Labno asked, "What about the garage?" FERGUSON initially replied that Tim FERGUSON did not have control over the garage or the house and that KM and F owned that house. FERGUSON then stated, "Everything in the garage is mine." S/A Labno then asked what FERGUSON meant and FERGUSON stated, "All the stuff that's in the garage there (7029) is mine. In response to Agents questions, FERGUSON stated that there was about "a pound of weed and some other things" in the garage. S/A Labno asked were the "things" were and FERGUSON responded, "the cabinet."

11. At this point, FERGUSON renewed his request to be released and start cooperating with Agents. FERGUSON stated, "You really don't have me on much." S/A Labno asked FERGUSON when was the last time he sold cocaine? FERGUSON responded, "It's been awhile." Agents responded, "Yeah, like a week." Agents then told FERGUSON that they wanted to take him to their office to talk further about his pending cooperation and FERGUSON agreed. FERGUSON then advised that he wanted the police to leave his house and not further upset his family. S/A Labno explained that the police presence would be dramatically scaled back and that his family and children were free to go wherever they wanted and that Agents would help them get rides to school and help his (FERGUSON's) wife get the other children where they needed to go. FERGUSON thanked Agents and expressed a desire to quickly move forward with his cooperation. S/A Burney then explained that Agents had a search warrant for FERGUSON's cellular telephone. FERGUSON told Agents that the phone

was on or next to his bed. Agents asked if there was a code on the phone. FERGUSON stated, "No, it's unlocked."

12. At this point, S/A Labno introduced FERGUSON to S/As O'Connor and Fries. S/A Labno explained that Agents O'Connor and Fries would transport FERGUSON to the ATF office where S/As Labno and Burney could conduct a further interview with FERGUSON. FERGUSON stated that he agreed and wanted to get off-scene as quickly as possible. FERGUSON again repeated that he was willing to work with Agents 1001% and do everything he could to help Agents' investigation. Agents O'Conner and Fries then transported FERGUSON to the ATF office where he was secured in an interview room and provided a bottle of water.

13. At this point, S/As Labno and Burney approached Cherie FERGUSON to conduct a brief interview. S/A Labno advised Cherie FERGUSON that she did not have to speak with Agents and that she was free to leave the residence. Cherie FERGUSON explained that she understood her rights and wanted to cooperate with Agents. In response to S/A Labno's questions, Cherie FERGUSON advised that her marriage to her husband Terry was "only on paper" and that it had become a marriage of convenience. Cherie FERGUSON stated that she slept in her son's bedroom and that Terry FERGUSON would leave the house everyday at 8 a.m. and return at 10 p.m. and that she did not know what he did or where he went during those hours. Cherie FERGUSON stated that she and her husband Terry kept separate finances and that she made a salary of approximately one hundred fifty-seven thousand dollars and that she used this money to pay household expenses, pay the mortgage and any other expenses.

14. Cherie FERGUSON stated that she did not give Terry money for his work or much else and that he worked rehabbing houses. Cherie FERGUSON stated that she completed the joint tax return which she filed for herself and Terry FERGUSON and that she based these tax filings on her W2 and whatever information Terry FERGUSON provided to her. S/A Labno stated that for the last five to six years Terry FERGUSON had claimed that his remodeling business had lost money each year and that this was what she reported on the tax returns. Cherie FERGUSON stated that her husband Terry did not keep accurate records or receipts and that he merely told her what to file and that she believed that he lost money. Cherie FERGUSON also stated that FERGUSON had rental properties and derived income from these sources. Again, S/A Labno advised that for the last five or more years the FERGUSON's had reported a loss from rental properties on their tax returns. Cherie FERGUSON explained that this was possible as many of the rental properties owned by her husband were in terrible neighborhoods and that when a tenant moved out he often had to gut the structure because of destructive tenants. With regard to United States Currency (USC) in the residence, Cherie FERGUSON stated that she had no cash money in the residence and that any money found in the residence was not hers or her children's. Cherie FERGUSON explained that she did not know her husband to have any money in the house. Cherie FERGUSON stated that if they had any extra money it went to pay off college loan debt generated by her older children. S/A Labno advised that Terry FERGUSON had already told Agents that he had approximately $18,000 in cash bundled into a brick in the upstairs master bedroom. Cherie FERGUSON denied any knowledge or ownership of this money.

15. At this point S/A Burney explained to Cherie that they had a federal search warrant for Terry's cellular phone. S/A Burney told Cherie that during an earlier conversation with Terry, he told Agents that his phone was located on or near his bed. Agents then followed Cherie FERGUSON as she went upstairs to the bedroom that Terry sleeps in and pointed out Terry FERGUSON's cellular telephone. S/A Burney then recovered Terry's black iPhone which was named in the search warrant. S/A Burney was able to access FERGUSON's iPhone, as it was unlocked, as stated earlier by FERGUSON.

S/A Burney also observed, in plain view, a bulky white wrapped up t-shirt on top of the headboard that matched the description FERGUSON gave to Agents earlier, which contained $18,000 in cash, according to FERGUSON.

16. S/A Burney and Cherie then returned downstairs. Agents then asked if Cherie FERGUSON had been prescribed opioid painkillers and Cherie FERGUSON advised that she had been prescribed hydrocodone "Norco" painkillers after a past surgery. Cherie FERGUSON volunteered that her husband felt that she might be addicted to the hydrocodone and so kept her pill bottle in their black GMC truck. Cherie FERGUSON explained that she only took six and a half "Norco's" a day and that she did not feel like she was drug addicted. At this point, TFO Stenzel explained that Agents had recovered her pills and pill bottle pursuant to a search warrant Agents executed at 7038 W. 72nd Street, Chicago, Illinois. Cherie FERGUSON became extremely upset and explained that those pills were hers and that her husband would not have taken them elsewhere. At this point, S/As Labno and Burney asked Cherie FERGUSON if she would consent to a search of the black GMC truck and Agents could look for her pills. Agents explained that Cherie FERGUSON had every right to refuse to consent to this search and require Agents to seek a search warrant. Cherie FERGUSON stated that she understood this and was willing to still consent to a search. S/A Burney then provided her with ATF Form 3220.11, Consent to Search Form. S/A Burney then read this form to Cherie FERGUSON, explaining each right concerning a consent search—especially the fact that Cherie FERGUSON had every right to refuse to allow Agents to search the black GMC Denali. Cherie FERGUSON explained that she understood her rights and was willing to waive them and allow Agents to search the truck. Cherie FERGUSON then signed this form to memorialize her understanding of her rights as well as her willingness to agree to a consent search. S/As Labno and Burney then signed this form as witnesses.

17. Cherie FERGUSON then retrieved her keys and opened the truck for Agents. Agents then conducted a systematic search of the truck and recovered the following pieces of evidence: Numerous miscellaneous documents of indicia, (1) black wallet, (3) belts, $1550 in cash, (4) separate checks totaling $3550, (5) watches, and $950 in suspected counterfeit currency.

18. After the search of truck was complete, Agents secured the truck and returned the keys to Cherie FERGUSON. Agents explained that they had not found any of her pill bottles in the truck and Cherie FERGUSON stated that she knew as she had been present for the search. S/A Labno should note that TFO Stenzel and Financial Investigator Mike Priess then conducted an interview with Cherie FERGUSON which is documented in a separate Report of Investigation (ROI).

19. On November 7, 2018, S/A Koslowski returned several items of personal property to Cherie FERGUSON while she attended FERGUSON's detention hearing at federal court located at 219 S. Dearborn, Chicago, Illinois. (See attached ATF Form 3400.23)

20. This is only a summary of these events and not intended to be a verbatim account.

**ATTACHMENTS:**

- ATF Form 3220.11.
- 18M684 Search Warrant return
- ATF Form 3400.23 (truck consent search)
- ATF Form 3400.23 (returned property)