**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Report Number: |
| --- |
| 174 |

## SUMMARY OF EVENT:

Interview and subpoena service of Debbie Jo O'BRIEN.

## NARRATIVE:

1. **INTERVIEW:** On November 15, 2018, at approximately 13:20 hours, ATF TFO Christopher Stenzel and Special Agent (S/A) Christopher Labno conducted an interview of Debbie Jo O'BRIEN, White Female, DOB: ▮▮▮▮ in the presence of Department of Children's Services (DCS) employees Whitney Williams and Jacqueline Stephens located at 661 Broadway, Gary, Indiana. O'BRIEN was meeting with Whitney Williams, family services case manager and her supervisor, Jacqueline Stephens, regarding the matter of O'BRIEN's children and their school attendance.

2. It should be noted that on November 14, 2018, at approximately 1000 hours, TFO Stenzel and S/A Labno had met with Whitney Williams at the same location. Williams told agents that she was investigating O'BRIEN due to her children missing a large amount of school days without proper justification. Williams stated that on September 21, 2018, she met with O'BRIEN at O'BRIEN's residence located at ▮▮▮▮, Gary, Indiana. While conducting her investigation, O'BRIEN made numerous unrelated statements to Williams that she (O'BRIEN) had won a large settlement but that the proceeds had been stolen by her father and uncle. Williams told Agents that the following statements made by O'BRIEN on this day were made in the context of, and along with a request for guidance, financial help and assistance finding new housing:

   a. ▮▮▮▮

   b. O'BRIEN said the church tried to cover up

   c. O'BRIEN told Williams that her uncle and father had the idea to sue the church and O'BRIEN stated she had given her uncle power of attorney. O'BRIEN stated her uncle controlled her settlement funds. O'BRIEN stated that giving her uncle power of attorney was the worst mistake she made.

   d. O'BRIEN stated her uncle gives her a monthly allowance, about $500.00, which only covers O'BRIEN's rent, which she pays to her father, Charles REYNOLDS.

   e. O'BRIEN stated she believes her uncle and father are misusing her (O'BRIEN's) settlement funds. She stated her father has a new car that she thinks was purchased with her settlement funds.

   f. O'BRIEN stated she has asked her uncle for money on numerous occasions but her uncle will not comply.

| Prepared by:<br>Christopher A. Stenzel | Title:<br>Task Force Officer, Chicago I Field Office | Signature: | Date:<br>1/2/18 |
| --- | --- | --- | --- |
| Authorized by:<br>Bennie Mims | Title:<br>Group Supervisor, Chicago I Field Office | Signature: | Date:<br>1/2/18 |
| Second level reviewer (optional):<br>Celinez Nunez | Title:<br>Special Agent in Charge, Chicago Field Division | Signature: | Date: |

Page 1 of 6

ATF EF 3120.2 (10-2004)
For Official Use Only

g. O'BRIEN told Williams she was afraid she would end up homeless if she pursued her settlement funds because she lives with her father, and her father would likely get in trouble for misusing her money.

h. O'BRIEN asked Williams if DCS could assist her in acquiring housing so she could remove her family from her father's residence.

3. Williams told Agents that she found O'BRIEN's story incredible, and without any facts wasn't sure if she (O'BRIEN) was in fact entitled to a large sum of money. Williams told O'BRIEN that she would be following up on the status of O'BRIEN's children's school attendance. Williams told Agents that she had subsequently discussed O'BRIEN's story with her supervisor and would be documenting it in her final report.

4. On November 15, 2018, O'BRIEN had agreed to meet with Williams at the DCS office listed above. O'BRIEN met with Williams and Stephens (Supervisor) and discussed the children. Once the discussion was concluded at approximately 12:15 hours, TFO Stenzel and S/A Labno entered the office and explained to O'BRIEN that she was not in trouble or under arrest. Agents related that they believed O'BRIEN may be the victim of a crime related to a large settlement O'BRIEN received in 2014. Agents stated that they believed Terry FERGUSON, O'BRIEN's uncle, had absconded with (stolen) funds awarded to O'BRIEN, roughly totaling $629,000 to date.

5. O'BRIEN responded substantially to questions from the investigating agents, as follows:

a) Agents asked O'BRIEN if she knew that her settlement was for $1.2 million. O'BRIEN stated she did not know that fact, but knew it was a large amount of money. O'BRIEN stated she believed she wasn't allowed to discuss the money awarded to her because there was a "gag order" that she signed in front of a judge. Agents explained that there was no legal order related to her money, but rather the confidentiality of parties to the settlement. O'BRIEN explained that that may be the case, but she had been told by her uncle and his lawyer that if she discussed the money or the settlement she could go to jail.

b) Agents asked O'BRIEN if she was aware that FERGUSON received yearly checks around September for approximately $61,000. These checks were issued to "Debra Millwood" (O'BRIEN's maiden name). O'BRIEN stated she did not know that FERGUSON still received checks for her settlement. Agents then showed O'BRIEN copies of settlement checks deposited by FERGUSON into FERGUSON's Bridgeview bank acct ███. O'BRIEN observed the first check issued to her which was deposited on September 4, 2014. The check was for $395,517.00 and the memo on the check read "2014 settlement proceeds. Agents asked O'BRIEN if she signed this check, as her signature appears on the copy of the check. O'BRIEN stated that she did sign this check and that her uncle put her on his bank account. Agents then showed O'BRIEN three additional checks issued to "Debra Millwood", signed by Debra Millwood, and deposited by FERGUSON into FERGUSON's Bridgeview Bank Acct ████. The first check was deposited on September 4, 2015, with a value of $55,000 with the memo "settlement proceeds". Agents showed O'BRIEN that the check was signed again by Debra Millwood and O'BRIEN stated she did not sign the check. Agents showed O'BRIEN similar checks for $61,111 deposited by FERGUSON into FERGUSON's Bridgeview Bank Acct ████ on September 12, 2016, and August 31, 2017. O'BRIEN again viewed the signature and stated she did not sign these checks. Agents asked if she was aware that FERGUSON had recently deposited a $61,111 check issued to Debra Millwood into the same account on September 4, 2018. O'BRIEN stated she did not know about any of the additional checks being issued to her and had not signed the check in question.

c) O'BRIEN stated that she thinks her name was being signed on the checks because she gave FERGUSON her power of attorney.

ATF EF 3120.2 (10-2004)
For Official Use Only

d) Agents then asked O'BRIEN if she ever loaned FERGUSON money from her settlement to purchase a home. O'BRIEN stated she had never agreed to loan FERGUSON any money. O'BRIEN stated that FERGUSON was to control the money because she thought she would "blow it" on useless things. She agreed to give FERGUSON her power of attorney as long as FERGUSON was there when she needed money. Agents asked how often FERGUSON would give O'BRIEN money. O'BRIEN stated FERGUSON would give her cash when she needed money. O'BRIEN stated FERGUSON gave her various amounts of cash 5 or 6 times since 2014. O'BRIEN stated that the largest amount of cash FERGUSON had given her with respect to these five or six discernments was $1,500.00.

e) Agents explained to O'BRIEN that FERGUSON had deposited the initial settlement check for $395,517 and immediately used the funds to purchase FERGUSON's personal residence at 8143 Sunset Rd., Willowbrook, Illinois in Cherie FERGUSON's name (wife of Terry). O'BRIEN stated she did not know FERGUSON used her settlement funds to purchase his residence. Agents explained that Cherie FERGUSON told investigators that O'BRIEN had loaned the money to Terry FERGUSON to purchase the residence. Agents also explained that Cherie had recently acquired a mortgage on the residence for $200,000. Agents explained that Cherie had told the agents that this mortgage was used to repay O'BRIEN for her initial loan. O'BRIEN stated she never received any funds from Cherie or Terry FERGUSON as a loan repayment.

f) Agents then asked O'BRIEN if she was aware that her father, Charles REYNOLDS, had received $20,000 on September 15, 2014, from FERGUSON after the deposit of the initial check. O'BRIEN stated she knew REYNOLDS had received money from her settlement, but not the exact amount. O'BRIEN stated that she understood that REYNOLDS used these proceeds to purchase the residence at 25ᵗʰ Ave. Agents explained that the owner of record at this residence was in fact not REYNOLDS but rather Lisa HENSLEY. O'BRIEN stated she did not know this fact, but recognized HENSLEY as cousin-in-law who had won the lottery. In response to Agents' questions, O'BRIEN stated that she understood it was against her interests that her settlement money had been used to pay-off the house she was currently living in and paying rent to live in with her children.

g) O'BRIEN stated FERGUSON had pushed O'BRIEN for years to agree to sue the temple but O'BRIEN was reluctant. When O'BRIEN finally agreed to follow through with the lawsuit, FERGUSON found a lawyer to take the case named Beau BRINDLEY. BRINDLEY had a partner named Mark BROWN. O'BRIEN stated the original agreement was for FERGUSON and O'BRIEN to equally split the proceeds of the settlement because FERGUSON was doing the leg work with the lawyers. O'BRIEN stated that BROWN didn't like the idea and wanted the proceeds to go into a trust ▮▮▮▮▮▮ O'BRIEN stated FERGUSON and BRINDLEY fought BROWN's idea because they thought O'BRIEN should be rewarded for the tragedy that had befallen her. O'BRIEN stated she thought BRINDLEY had FERGUSON's interests in mind during the settlement process instead of her own.

h) O'BRIEN stated that FERGUSON was more of father figure to her than anyone else. O'BRIEN stated she did not get along with her father (REYNOLDS). O'BRIEN stated FERGUSON has always been there for her whenever she needed something.

i) O'BRIEN then stated she signed an agreement with FERGUSON and the agreement had been signed in the presence of a notary; O'BRIEN stated that FERGUSON or his lawyer should have a copy of this document. This agreement was for O'BRIEN to receive from the settlement proceeds a house, a car, a

ATF EF 3120.2 (10-2004)
For Official Use Only

Title of Investigation

Investigation Number

Report Number: 174

$10,000 shopping spree for her kids, and a trip to Disneyworld. O'BRIEN stated that she understood that this agreement provided that FERGUSON was to receive the rest of the settlement proceeds and keep this money for her and her children, making it available when she needed it. O'BRIEN stated she received the $10,000.00 shopping spree for her children, but the house, car, and trip to Disneyworld were never provided. O'BRIEN stated that every time her kids see FERGUSON they ask him when he is taking them to Disneyworld, but FERGUSON has never followed through with the agreement. In response to Agents' questions, O'BRIEN stated that she did not think that the agreement was working out to the way she expected or to her benefit. O'BRIEN stated that she is currently behind on her car payments and cannot afford the $699.00 a month car payment for her KIA. In addition, O'BRIEN stated that she needed a house and a car and despite her repeated requests to FERGUSON he never gave her either.

j) Agents then showed O'BRIEN a photo posted on facebook.com by a FERGUSON family member from approximately 2017. The photo depicts FERGUSON, his wife Cherie, his ex-wife Tammy, seven of his children, five of his grandchildren, and two other family members standing with Mickey Mouse in a castle at Disneyworld. This photo was posted along with other photos depicting the family at Disneyworld. Agents asked O'BRIEN if she was aware of this family trip taken by FERGUSON. O'BRIEN stated she did not know about the trip. Agents should note that O'BRIEN became visibly upset, again explaining that her children have never been to Disneyworld despite FERGUSON's promise and her settlement money.

k) Agents asked O'BRIEN if she knew a man named John DEIR. O'BRIEN stated she did not know anyone by that name. Agents asked if O'BRIEN was aware that John DEIR had received $30,000 on September 10, 2014, from FERGUSON after the deposit of the initial check. O'BRIEN stated she did not authorize FERGUSON to distribute her money to DEIR.

l) Agents explained that after the deposit of the settlement checks, FERGUSON would usually make large payments to credit card companies for outstanding credit card debt. O'BRIEN stated she never authorized FERGUSON to pay his credit card debt with her settlement proceeds.

m) Agents explained to O'BRIEN that following the deposit of the $55,000 settlement proceeds check on ▓▓ W. 2▓th Ave. because she did not get along with REYNOLDS. O'BRIEN stated this daughter pays rent to FERGUSON. Agents September 4, 2015, FERGUSON used the newly acquired funds to purchase a residence at Ave., Gary, Indiana. FERGUSON wired $39,380 to Meridian Title Corp. on September 23, 2015, to complete the purchase. O'BRIEN stated she was not aware that FERGUSON had used her settlement proceeds to purchase this residence.

n) O'BRIEN stated that her oldest daughter currently lives with her boyfriend in a house owned by FERGUSON. O'BRIEN explained that her daughter wanted to move out of ▓▓ 5th Ave. because she did not get along with REYNOLDS. O'BRIEN stated this daughter pays rent to FERGUSON. Agents believe this residence to be located at ▓▓ Gary, Indiana. O'BRIEN stated that she is very concerned for her daughter ▓▓ O'BRIEN stated that she was very over-protective of her daughter due to what had happened to her (O'BRIEN). O'BRIEN stated that she is very proud of her daughter who goes to school and has a CNA certificate as well.

o) Agents explained that, to date, FERGUSON has deposited $639,990 in checks issued to Debra Millwood for settlement proceeds into his Bridgeview Bank Acct. ▓▓ Agents observed only two checks written from this account to O'BRIEN; a $1,200 check on October 15, 2014 and a $9,746 check

ATF EF 3120.2 (10-2004)
For Official Use Only

Report Number:
174

on September 16, 2016. During the interview, O'BRIEN acknowledged receipt of these checks. O'BRIEN explained that these checks made up the "shopping spree" she had been promised for her children. When asked how much cash FERGUSON has given O'BRIEN since the settlement agreement, O'BRIEN stated less than $30,000.

p) In response to Agents questions, O'BRIEN acknowledged that she told Williams that she believed FERGUSON and REYNOLDS were misusing her settlement funds when Williams visited her residence on September 21, 2018. O'BRIEN stated that she understood that her past attorney was Beau BRINDLEY but that she recently had spoken to a local lawyer, Shane O'Donnell, who was helping O'BRIEN with some traffic violations. O'BRIEN told O'Donnell that she wanted to fight for her settlement proceeds and O'Donnell told her to contact the Bar Association to get help.

q) O'BRIEN stated that on the previous day, November 14, 2018, she had travelled to Chicago to speak with a lawyer regarding the matter of her settlement proceeds. O'BRIEN stated the lawyer was a female but she did not remember her name. O'BRIEN stated she had the lawyer's card in her pants pocket at her residence.

r) In response to Agents' questions as to why O'BRIEN had tolerated FERGUSON not providing O'BRIEN with her own money when she was clearly in need, O'BRIEN explained that she was bad with money and would have blown the proceeds of the lawsuit had she had full access. O'BRIEN stated that she did not know how to purchase a home legally or how to negotiate a car loan as evidenced by her current issues with repossession. O'BRIEN stated that FERGUSON had always been in her corner more than anyone else, and that she had wanted him to keep her money safe for when she or her children needed money. In response to Agents questions, O'BRIEN stated that FERGUSON had not done this, he would not buy her a house with her money or a car despite her repeated requests. S/A Labno explained that based upon their investigation, Agents were aware that FERGUSON had spent most of the money from her settlement, not kept it safe for O'BRIEN or her children's use. O'BRIEN stated that she understood this and that it had been a source of arguments between her and her husband. O'BRIEN stated that her husband repeatedly told her that she was being taken advantage of and stolen from and that he "hurt because he saw her hurting." O'BRIEN stated that these concerns had caused her to reach out to Ms. Williams and seek the advice of another lawyer to try to get her settlement money back.

s) Agents then served O'BRIEN with a Grand Jury Subpoena to appear on November 28, 2018. Agents explained that O'BRIEN could obtain her own lawyer, separate from anyone provided or recommended from parties involved in this matter. Agents asked O'BRIEN to have her attorney contact the agents regarding the subpoena and the misuse of O'BRIEN's settlement funds by FERGUSON and others. Agents then provided their phone numbers to O'BRIEN. Agents explained that O'BRIEN must show to the Federal Grand Jury on the above described date or she would risk being found in contempt of court and subject to arrest.

t) Agents then offered to provide temporary housing as well as other victim services for O'BRIEN and her immediate family in case there were negative consequences as a result of her cooperation in this investigation. O'BRIEN stated she would think about her options and contact agents with the name and phone number of her attorney.

u) After Ms. Williams had walked O'BRIEN out of the facility, she returned to Agents and explained that while walking out, O'BRIEN had renewed her request to Williams for Child Protective Services to

ATF EF 3120.2 (10-2004)
For Official Use Only

Report Number:
174

provide her with financial resources as well as housing resources as she had no way to pay for these items.

6. At approximately 13:05 hours, the interview was terminated and O'BRIEN left the DCS building.

7. At approximately 15:00 hours, S/A Labno called O'BRIEN at ███████████ and O'BRIEN did not answer the phone. A short time later, in response to a text message sent by S/A Labno asking for her lawyers contact information, S/A Labno received a text message from O'BRIEN which read:

"My lawyer is beau brindley 1-312-502-5232 I have nothing to say contact him I have talked to him I gave him your number!!!!!"

6. This is only a summary of these events and not intended to be a verbatim account. reference should be made to the referenced reports of investigation and inventories for more information.

ATF EF 3120.2 (10-2004)
For Official Use Only